**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:15CR178 |
| Plaintiff, | ) | |
| | ) | FINDINGS AND |
| v. | ) | RECOMMENDATION |
| | ) | |
| BRIAN ROBINSON and | ) | |
| KIMBERLY SANTIAGO ROBINSON, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the Motion to Suppress (Filing No. 94) filed by defendant Brian Robinson (Robinson). Defendant Kimberly Santiago Robinson (K.S. Robinson) filed a motion to join (Filing No. 102) in Robinson's motion to suppress, which is granted to the extent K.S. Robinson may have standing.[1] The defendants seek to suppress evidence seized from Robinson's vehicle which was stopped and searched by law enforcement officers on April 25, 2014, as Robinson was traveling on Interstate 80 in Seward County, Nebraska. Robinson also seeks to suppress any statements he made to law enforcement officers as a result of the traffic stop.

The court held evidentiary hearings on the motions on June 30 and November 29, 2016. Robinson was present for both hearings with his counsel David M. Michael and James A. Bustamonte. K.S. Robinson was also present for both hearings with her counsel Zenia K. Gilg. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda at both hearings. At the June 30, 2016, hearing, the court heard the testimony of Sergeant Michael Glenn Vance (Sergeant Vance) of the Seward County Sheriff's Office (SCSO) and received into evidence the following exhibits: a video and audio tape of the traffic stop (Exhibit 1); a **Miranda** waiver form (Exhibit 2); a traffic warning citation (Exhibit 3); an April 11, 2014, radar certification (Exhibit 4); a certification of completion (Exhibit 4); an April 1, 2015, radar certification (Exhibit 5); an October 31,

---

[1] The court finds the evidence shows K.S. Robinson enjoyed a sufficient property interest in the pickup to give her standing to challenge the search. See *United States v. Fuller*, 374 F.3d 617, 621-22 (8th Cir. 2004); **see also** *United States v. Powell*, 929 F.2d 1190, 1195 (7th Cir. 1991) ("Ownership creates, in other words, an expectation of privacy that society is prepared to recognize as 'reasonable.'").

2014, deposition transcript (Exhibit 101); an April 25, 2014, traffic stop video and radio communication (Exhibit 103); a warning citation form (Exhibit 105); a training log for Sergeant Vance and Igor (Exhibit 109); a K-9 team log for Igor and Sergeant Vance (Exhibit 110); a K-9 Field Performance Report (Exhibit 111); a declaration of K.S. Robinson (Exhibit 112); a certified copy of a marriage certificate (Exhibit 113); and a loan document regarding a vehicle (Exhibit 114). At the request of the parties, the June 30, 2016, hearing was continued pending the filing of the transcript of that hearing and the subsequent availability of counsel and expert witnesses for an additional hearing. The transcript of the June 30, 2016, hearing was prepared and filed on July 26, 2016 (Filing No. 153). The next evidentiary hearing was scheduled for November 29, 2016.

At the November 29, 2016, hearing, the court heard the testimony of Andre Falco Jimenez (Mr. Falco) and Sergeant Russell Lewis (Sergeant Lewis) of the Nebraska State Patrol (NSP). The court also received into evidence the Curriculum Vitae (C.V.) of Mr. Falco (Exhibit 115). A transcript of the hearing was prepared and filed on December 9, 2016 (Filing No 183). The defendants filed post-hearing briefs on December 7, 2016 (Filing Nos. 181 and 182). The government filed a post-hearing brief on December 14, 2016 (Filing No. 184).

## FINDINGS OF FACT

On April 25, 2014, Sergeant Vance was in uniform and on patrol on Interstate 80 in Seward County driving a marked SCSO cruiser. He was accompanied by his service K-9, Igor. Sergeant Vance and Igor have been trained and certified as a Narcotic Odor Detection Dog Handler team and their certification was current at the time of the traffic stop (Exhibit 109). In mid-afternoon, Sergeant Vance observed a red 2008 GMC Sierra pickup on Interstate 80 in Seward County, Nebraska, which he radar-checked traveling westbound at 79 miles per hour in a 75 mile per hour speed zone. Further, Sergeant Vance observed the pickup following too close, less than a car length, behind another vehicle and conducting improper lane changes. Sergeant Vance engaged his overhead lights and gave pursuit. Sergeant Vance's patrol vehicle was equipped with an audio-visual recorder which was engaged. The pickup stopped on the shoulder of the

Interstate near the Goehner exit. Sergeant Vance radioed to dispatch that he was on a traffic stop and provided the Pennsylvania license plate number for the pickup. Sergeant Vance got out of his cruiser and approached on the driver's side of the pickup. The driver and sole occupant of the pickup was Robinson. Sergeant Vance asked for Robinson's driver license and registration. He also informed Robinson the stop was for speeding, following too closely, and conducting improper lane changes. Sergeant Vance observed Robinson's hands to be shaking "very badly." As Sergeant Vance told Robinson that Sergeant Vance was going to issue him a warning for the infractions, Sergeant Vance noticed a Black Ice air freshener hanging from the rear view mirror and an air freshener on top of a duffel bag laying in the rear floorboard of the pickup. Sergeant Vance testified from his experiences that a Black Ice air freshener was often used by drivers when he found drugs in the vehicle. While an air freshener hanging from the rear view mirror was not abnormal from other traffic stops, an air freshener on top of the duffel bag was abnormal.

Sergeant Vance asked Robinson to get out of the pickup and join him in the patrol vehicle. Robinson complied, walked back to the patrol vehicle with Sergeant Vance, and had a seat in the front of Sergeant Vance's patrol vehicle. Sergeant Vance then called by radio into the E-911 center dispatchers for a 10-29, a 10-60, and a Triple I Check. The 10-29 call is a warrants check, which came back negative. The 10-60 is a driver's license check, which came back indicating that Robinson's license was valid. The Triple I Check is for wants and warrants. While the radio checks were being performed, Sergeant Vance engaged Robinson in conversation. Robinson stated he was coming from Pittsburgh and was headed to Fairfield, California. Robinson said it took three or four days to get to where the pickup was stopped. Sergeant Vance found the answer to be odd. Robinson stated he traveled between California and Pittsburgh three or four times a year as a real estate agent. Sergeant Vance found Robinson's answer to be strange about being a real estate agent on both coasts. Dispatch does not identify the Triple I Checks in plain language because a suspect may be sitting in the patrol car or intercepting the call, a 10-50 code is used for dangerousness, a 10-40 code is used for narcotics, and a "positive" is used for a prior criminal history. Dispatch radioed a

positive, indicating a prior criminal history, but negative for the 10-40 and 10-50. Sergeant Vance returned Robinson's license and registration, completed the warning citation, and asked Robinson to sign the warning. The whole process took about twelve to fifteen minutes.

Robinson was told he was "good to go," and Robinson opened the passenger side door of the patrol car. Robinson placed one foot outside the door as Sergeant Vance asked Robinson if he could ask Robinson a few questions. Robinson said "yeah." Sergeant Vance asked Robinson if he had any weapons in his vehicle, and Robinson looked straight at Sergeant Vance and said "no." Sergeant Vance asked Robinson if there was a large amount of U.S. currency in the vehicle. Robinson started shaking, looked toward his vehicle, and said "no." Sergeant Vance stated from his experience, a driver's nervousness subsides after the driver is informed that a warning will be given. When Sergeant Vance asked Robinson if there were any drugs in the vehicle such as marijuana, cocaine, or methamphetamine, Robinson looked straight at Sergeant Vance and said "no." Sergeant Vance then asked Robinson if he could search the truck. Robinson did not say no, but said "I need to get going, I am in a hurry. I have to pick my dog up at the airport on Saturday." Sergeant Vance said, "That's fine. I am just going to get my K-9 out and run him around your vehicle." Robinson commented that he had dog food in the back of his pickup.

As Sergeant Vance got out of the patrol car to get his K-9, Robinson put his foot back inside the patrol car and closed the passenger side door. Sergeant Vance removed Igor from the patrol vehicle and walked Igor around the pickup, starting on the passenger side. According to Sergeant Vance, Igor indicated at the seam of the driver's door and indicated again at the seam on the back driver's door of the cab. Sergeant Vance rewarded Igor and placed Igor back in the patrol vehicle. Sergeant Vance asked Robinson if he knew of any reason the dog would indicate on the truck, and Robinson said "no." Sergeant Vance asked Robinson if he was sure he didn't have drugs or large amounts of cash in the truck, and Robinson said "no." A backup deputy from the SCSO, Sergeant Hitz, arrived and both Sergeant Vance and Sergeant Hitz began to search the pickup. Inside the duffel bag were large amounts of U.S. currency in vacuum-sealed

packages. The duffel bags also contained marijuana debris. Robinson was arrested and transported to the SCSO where he was **Mirandized** and inetrrogated by HSI Special Agent Reiz and Sergeant Vance.

Mr. Falco testified as to his experience and training of K-9 detection teams. Mr. Falco testified he viewed the audio and video of Sergeant Vance's stop of Robinson's pickup and the deployment of Igor around the pickup. While Mr. Falco could not observe the actions of Sergeant Vance and any reaction of Igor while in front of the pickup or any reactions of Igor while Sergeant Vance's backward movement blocked sight of Igor, Mr. Falco believed Sergeant Vance's deployment of Igor was improper and Mr. Falco did not observe a true indication or alert by Igor.

Sergeant Lewis testified he is a supervisor of dog handlers within the NSP and explained his training and certification techniques. He reviewed the training and deployment records of Sergeant Vance and Igor and opined Sergeant Vance was successfully deploying Igor, Igor was giving the correct responses, and the team was detecting drugs (TR. 146). Sergeant Lewis also could not observe an alert by Igor on Robinson's pickup after viewing the video, but he, like Mr. Falco, stated he was blocked from viewing the entire deployment by the positioning of the patrol car's camera and Sergeant Vance's body.

## DISCUSSION

A law enforcement officer's observation of a traffic violation provides probable cause to stop a vehicle. **United States v. Hollins**, 685 F.3d 703, 705-06 (8th Cir. 2012). An officer's subjective motivations do not affect the reasonableness of a traffic stop based on the violation of the traffic laws. **United States v. Frasher**, 632 F.3d 450, 453 (8th Cir. 2011). Moreover, the stop is valid even if the police would have ignored the traffic violation but for the suspicion that greater crimes were afoot. **Id.** In this case, Sergeant Vance observed Robinson to commit three traffic violations: speeding, following too closely, and improper lane changing. There was probable cause to stop Robinson's pickup on April 25, 2014.

Contemporaneous with a valid traffic stop, the officer may "conduct an investigation that is reasonably related in scope to the circumstances that initially justified the stop." *United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010). In fact, a police officer may detain the occupants while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013); **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the driver and other occupant's destination, purpose of the trip and whether the police officer may search the vehicle. *Id.*; *United States v. Mendoza,* 677 F.3d 822, 828 (8th Cir. 2012).

"If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting** *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995)). Specifically, an officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers. *Bracamontes*, 614 F.3d at 816; **see also** *United States v. Lyons*, 486 F.3d 367, 371-72 (8th Cir. 2007); *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999). In any event, the scope and length of any investigation must be reasonable. *Mendoza,* 677 F.3d at 828. "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008); **see also** *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 459 (8th Cir. 2011).

"The Fourth Amendment permits an investigative stop of a vehicle if officers have a reasonable suspicion the vehicle or its occupants are involved in criminal activity." *United States v. Smith*, 648 F.3d 654, 658 (8th Cir. 2011); **see** *Terry v. Ohio*, 392 U.S. 1, 25-31 (1968). The reasonable suspicion necessary to justify an investigatory stop must include "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; **see** *United*

*States v. Allen*, 705 F.3d 367, 370 (8th Cir. 2013). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Farnell*, 701 F.3d 256, 261 (8th Cir. 2012). "The standard is less difficult to meet than the probable cause standard required for arrests." *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008).

The court gives law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). This is because "the police possess specialized law enforcement experience and thus may 'draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous.'" *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005).

The brief encounter between Sergeant Vance and Robinson after the warning was given to Robinson clearly became a detention when, after being asked if the pickup could be searched, Robinson told Sergeant Vance he wanted to recommence his travel. At that time Sergeant Vance had reasonable suspicion to detain Robinson pending the K-9 sniff of the pickup. The presence of the air fresheners, the air freshener on the duffel bag, the Robinson's nervousness, the incongruity of Robinson's travel plans and business plans created reasonable suspicion to warrant the brief detention for the K-9 sniff.

Robinson challenges the indication by Igor. Sergeant Vance testified credibly, and at great length, as to his training and experience and Igor's training and experience. Sergeant Vance testified he believed Igor reacted to the pickup in a positive manner for the presence of narcotics. Under *United States v. Donnelly*, 475 F.3d 946, 945 (8th Cir. 2007), a positive reaction by a reliable drug detection dog constitutes probable cause to search. While Mr. Falco may train and certify K-9 detection teams differently, the court finds Sergeant Vance's handling of Igor on April 25, 2014, passes constitutional muster and finds Sergeant Vance had probable cause to search Robinson's pickup. Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE LAURIE SMITH CAMP** that:

1. Robinson's Motion to Suppress (Filing No. 94) be denied.
2. K.S. Robinson's motion to join (Filing No. 102) be granted.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

**IT IS FURTHER ORDERED** the parties shall have seven (7) business days following the ruling on the motion to suppress to file any other pretrial motions.

DATED this 30th day of December, 2016.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge